# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

GERALD A. SUMMERS,

                Plaintiff,

     v.

CITY OF MCCALL; a political
subdivision of the State of Idaho, and
EUGENE DRABINSKI, City Manager
for the City of McCall, DONALD
BAILY, Mayor of the City of McCall and
a City Council member, DR. MARCIA
WITTE, M.D., a member of the McCall
City Council, NICOLAS SWANSON, a
member of the McCall City Council,
JACKIE AYMON, a member of the
McCall City Council, LAURA SCOTT, a
member of the McCall City Council, in
their individual and official capacities,

                Defendants.

Case No. 1:13-CV-00203-EJL-CWD

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

Pending before the Court in the above-entitled matter is the Defendants Motion for

Summary Judgment and related Motion to Strike. The parties have filed their responsive

briefing and the matters are ripe for the Court's consideration. Having fully reviewed the

record, the Court finds that the facts and legal arguments are adequately presented in the

briefs and record. Accordingly, in the interest of avoiding further delay, and because the

Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Gerald A. Summers was appointed as the Chief of Police for the City of McCall, Idaho in November of 2005 and held that position until his termination on April 11, 2013. The facts giving rise to the claims in this case primarily revolve around the actions of Defendant Eugene Drabinski who was the interim and later became the permanent City Manager of the Defendant City of McCall (the "City").[1] Mr. Summers claims that Mr. Drabinski retaliated against him for various reasons including: supporting another candidate for the City Manager position, reporting Mr. Drabinski's aggressive behavior towards Mr. Summers and his creating of a hostile work environment, conducting a criminal investigation of the Valley County Sheriff's Office, filing a Notice of Tort Claim against Valley County, and reporting Mr. Drabinski's driver's license violations. (Dkt. 1.)

Prior to his termination, Mr. Summers had worked for the City's police department for several years ultimately ascending to the position of Police Chief. In August of 2012, Mr. Drabinski was appointed interim City Manager by the City Council while the City searched for a permanent City Manager. Mr. Summers applied for the permanent position but was eliminated from contention mid-way through the process. Mr. Summers then shifted his support to another candidate with whom he had previously worked, Carol Brockmann. Later

---

[1] The Defendants named in this action are: the City of McCall, Eugene Drabinski, the City Manager, Donald Bailey, the City Mayor, and the members of the City Council - Marcia Witte, Nicolas Swanson, Jackie Aymon, and Laura Scott. (Dkt. 1.)

in the search process, Mr. Drabinski submitted his own application for the permanent position. The City Council eventually appointed Mr. Drabinski as the permanent City Manager in November of 2012.

While Mr. Drabinski was still acting as interim City Manager, he and Mr. Summers had many interactions given their respective positions in the City. These interactions reveal that the two disagreed about several matters and/or had difficulty working together and communicating. One particular circumstance occurred in September of 2012 during a meeting at the police department where Mr. Drabinski was presenting the results of a public survey he had put out concerning the City's police force.[2] Mr. Summers disagreed with the accuracy and/or reliability of the survey. At the September 2012 meeting, Mr. Summers alleges that Mr. Drabinski became aggressive and threatening towards him prompting some who were present to report the actions to the City's Human Resources Manager. Other instances evidencing a conflict between the two arise from reports of Mr. Drabinski's driving violations, alleged retaliation and general threats of termination made by Mr. Drabinski towards Mr. Summers, Mr. Drabinski's accusations challenging Mr. Summers' loyalty and statements that Mr. Summers needed to "get on the bus," and the circumstances surrounding Mr. Summers' relationship with the Valley County Sheriff's Office.

In January of 2013, after being appointed permanent City Manager, Mr. Drabinski met with Mr. Summers and asked for his resignation and/or threatened to fire him. (Dkt. 1 at

---

[2]As City Manager, Mr. Drabinski commissioned a survey to get the opinions of the community regarding the police department. (Dkt. 1 at ¶ 47.)

¶¶ 66-68, 72.) Mr. Summers refused to resign and notified the City Council of Mr. Drabinski's retaliation. On February 1, 2013, Mr. Summers was place on paid administrative leave. (Dkt. 1 at ¶ 75.) Mr. Summers alleges the City did not conduct any investigation into his reports of retaliation. On February 15, 2013, a Notice of Proposed Personnel Action was issued wherein Mr. Drabinski proposed that Mr. Summers be terminated. On February 21, 2013, the City Council held a closed session to take up the proposal to terminate Mr. Summers. At this session Mr. Drabinski gave his reasons for recommending that Mr. Summers be terminated and asked the City Council to approve his request. Mr. Summers was then given the opportunity to refute the allegations and present his position to the City Council. Thereafter, the City Council considered the proposal to terminate Mr. Summers in three separate sessions. Ultimately, on April 12, 2013, the City Council approved the proposed action and a Notice of Termination was sent to Mr. Summers. Thereafter, on April 30, 2013, Mr. Summers initiated this case by filing the instant Complaint raising the following claims:

1. Wrongful Termination in violation of Idaho Code § 6-2101 re: investigation of the Valley County Sheriff's Office
2. Wrongful Termination in violation of Idaho Code § 6-2101 re: filing a Notice of Tort Claim against Valley County
3. Wrongful Termination in violation of Idaho Code § 6-2101 re: reporting workplace hostility by Mr. Drabinski
4. Wrongful Termination in violation of Idaho Code § 6-2101 re: reporting Mr. Drabinski's driving violation
5. Wrongful Termination in violation of Idaho Code § 6-2101 re: supporting a candidate other than Mr. Drabinski for the City Manager position
6. Violation of 42 U.S.C. § 1983 - deprivation of property interest in continued employment without due process

7.   Violation of Idaho Constitution - deprivation of property interest in continued employment without due process
8.   Violation of 42 U.S.C. § 1983 - deprivation of liberty interest without due process
9.   Violation of Idaho Constitution - deprivation of liberty interest without due process
10.  Violation of 42 U.S.C. § 1983 - deprivation of property interest without due process based on exercise of political speech
11.  Negligent infliction of emotional distress against the City
12.  Negligent infliction of emotional distress against Mr. Drabinski
13.  Negligent Supervision and Training against the City
14   Breach of the covenant of good faith and fair dealing

(Dkt. 1.) The Defendants have filed this Motion for Summary Judgment as to all of the claims raised in the Complaint. (Dkt. 11.) The Court finds as follows.

## STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to make such a showing on any essential element, "there can be no 'genuine issue of material fact,' since a completely failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.[3]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)). The Ninth Circuit cases are in accord. *See, e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

---

[3] *See also,* Rule 56(3) which provides, in part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Of course, when applying the above standard, the court must view all of the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

## ANALYSIS

### 1.    Motion to Strike

Defendants have filed a Motion to Strike portions of the Affidavit of Gerald A. Summers arguing the objectionable portions are inadmissible hearsay, improper opinion testimony, speculation, and irrelevant. (Dkt. 18.) Plaintiff maintains the statements in the Affidavit are all based on Mr. Summers' personal knowledge, relevant, and have the proper foundation. (Dkt. 19.) The Motion to Strike is granted in part and denied in part. The Court has reviewed the particular portions of the Affidavit objected to by the Defendants and will consider the same only to the extent they contain relevant facts of which Mr. Summers has personal knowledge that would be admissible. *See* Fed. R. Civ. P. 56(c)(4).

### 2.    Motion for Summary Judgment

The Motion for summary judgment seeks dismissal as to all of the claims raised in the Complaint. (Dkt. 11.) In his response brief, Mr. Summers has agreed that claims 5, 7, 9, 11, 13, and 14 should be dismissed. (Dkt. 13.)[4] Mr. Summers further states that the "whistleblower claims," 1-5, are plead only against the City and not the individual Defendants in their personal capacity. (Dkt. 13 at 3 n. 1.) As to the twelfth claim, Mr.

---

[4] As to Count 9, Mr. Summers concession to dismissal is conditioned upon this Court's agreement with prior decisions in this District. *See Sommer v. Elmore County*, 903 F.Supp.2d 1067, 1074 (D. Idaho 2012) (citing cases). The Court has reviewed those decisions and finds the reasoning to be sound and, for the reasons stated therein, the Court will dismiss the claim raised in Count 9 in this case.

Summers does not dispute that summary judgment should be granted on this claim as it is alleged against Mr. Drabinski in his official capacity as City Manager but maintains that the claim should go forward against Mr. Drabinski in his individual capacity. (Dkt. 13 at 19.) The Court agrees and will dismiss claims 5, 7, 9, 11, 13, and 14 in their entirety. Claims 1, 2, 3, 4, and 5 are dismissed against the individual Defendants in their personal capacity. Claim 12 will be dismissed as alleged against Mr. Drabinski in his official capacity. The Court will discuss the remaining claims below.

### A.    Idaho Protection of Public Employees Act Claims

The Idaho Protection of Public Employees Act (IPPEA), Idaho Code § 6-2101 *et seq.*, "seeks to protect the integrity of the government 'by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation.'" *Patterson v. State Dept. of Health & Welfare*, 256 P.3d 718, 724 (Idaho 2011) (quoting *Van v. Portneuf Med. Ctr.*, 212 P.3d 982, 987 (Idaho 2009)). This statute is commonly referred to as the "whistle-blower statute." *Mallonee v. State*, 84 P.3d 551, 555 (Idaho 2004). "To establish an IPPEA claim, a plaintiff must establish, by a preponderance of the evidence, 'that the employee has suffered an adverse action because the employee, or a person acting on his behalf engaged or intended to engage in an activity protected under section 6–2104, Idaho Code.'" *Patterson*, 256 P.3d at 724-25 (quoting Idaho Code § 6–2105(4)).

"Under Idaho's Whistleblower Act, a prima facie case for retaliatory discharge requires [the employee] to show: (1) he was an employee who engaged or intended to engage

in protected activity; (2) his employer took adverse action against him; and (3) the existence of a causal connection between the protected activity and the employer's adverse action." *Van v. Portneuf Med. Cntr.*, 330 P.3d 1054, 1059 (Idaho 2014) (quoting *Van*, 212 P.3d at 988). At trial on a claim for retaliatory discharge, the traditional *McDonnell-Douglas* balance shifting analysis applies. *Curlee v. Kootenai Cnty. Fire & Rescue*, 224 P.3d 458, 463 (Idaho 2008).

At the summary judgment stage however, there is a conflict in Idaho concerning whether or not the *McDonnell-Douglas* analysis applies to these types of claims.[5] *See Brown v. City of Caldwell*, No. 1:10-cv-536-BLW, 2012 WL 892232, at *6-7 (D. Idaho 2012) (applying the *McDonnell-Douglas* balancing test at the summary judgment stage to a IPPEA claim despite the Idaho Supreme Court's holding in *Curlee*); *Berger v. Madison Cnty.*, No. 4-12-cv-00535-CWD, 2014 WL 222067, at *7-8 (D. Idaho 2014) (declining to apply the *McDonnell-Douglas* analysis to a IPPEA claim at summary judgment based on *Curlee*); *Berrett v. Clark Cnty. School Dist. No. 161*, No. 4:12-cv-00626-EJL-CWD, 2014 WL 4926161 (D. Idaho 2014) (applying the *McDonnell-Douglas* analysis to a motion for summary judgment on an Idaho Whistleblower Act claim). This Court finds the *McDonnell-Douglas* burden shifting analysis is appropriate to apply to this Motion for Summary Judgment. *See Brown*, 2012 WL 892232, at *6-7 and *Berrett*, 2014 WL 4926161, at *8.

---

[5]The conflicting case law is the subject of a recent article in The Advocate discussing the two Idaho Supreme Court decisions of *Curlee* and *Hatheway v. Board of Regents of University of Idaho*, 310 P.3d 315 (Idaho 2013). *See* A. Dean Bennett & Scott E. Randolph, *Idaho Supreme Court Reverses Course in Applying the McDonnell Douglas Burden-Shifting Framework to Summary Judgment Motion*, 57-FEB Advocate 28, (Idaho 2014). The *Curlee* case involved a retaliatory discharge case brought under the IPPEA while the plaintiff in *Hatheway* raised several claims, including retaliation, under the Idaho Human Rights Act.

"When the McDonnell Douglas analysis is applied to cases involving retaliatory discharge under a whistleblower statute, the test is as follows: (1) the plaintiff must establish a prima facie case of retaliatory conduct for an action protected by the relevant whistleblower statute; (2) once the plaintiff demonstrates a prima facie case, the defendant is obligated to produce evidence which, if taken as true, would permit the conclusion that there was a non-retaliatory reason for the adverse action; and (3) if the defendant articulates a legitimate non-retaliatory reason for discharge, then the burden shifts to the plaintiff to prove by a preponderance of the evidence that the reason the defendant offers is a pretext for retaliatory conduct." *Curlee*, 224 P.3d at 463 (citation omitted); *see also Van*, 330 P.3d at 1059 (applying the *McDonnell-Douglas* analysis to the jury verdict in a trial on a retaliation claim). Applying this standard to the IPPEA claims in this case, the Court finds as follows.

### 1.    Investigation of Valley County Sheriff's Office

The first claim for relief alleges that Mr. Summers was a public employee who engaged in a protected activity, to-wit a lawful investigation of the Valley County Sheriff and members of her staff. (Dkt. 1 at ¶¶ 51-56, 94-100.)[6] Mr. Summers asserts his termination by the Defendants was causally connected to that protected activity and, therefore, in violation of the IPPEA. (Dkt. 1 at ¶¶ 94-100.) Defendants agree that Mr. Summers' investigation of the Valley County Sheriff's Office in January of 2012 was a protected activity under the IPPEA but contend that there is no causal connection between that protected activity and the adverse employment action. (Dkt. 11 at 8.)

---

[6] Mr. Summers details the circumstances surrounding the investigation in his Affidavit. (Dkt. 15, Summers Aff. at ¶¶ 21-25.)

Causation is generally an issue of fact to be decided by a jury. *See Van*, 212 P.3d at 559. The parties appear to agree that in order to prove the requisite causal connection for an IPPEA claim, the employee must prove that "but for" the protected activity, the adverse action would not have occurred. (Dkt. 11 at 8) (Dkt. 13 at 5.)

Mr. Summers argues the causal connection is evidenced by the February 15, 2013 Notice of Intent to Termination where Mr. Drabinski cited the "strained relationship with the Valley County Sheriff and others in that agency" as a reason for his termination and Mr. Drabinski's statements to Mr. Summers that the Valley County Sheriff did not want to work with Mr. Summers because of the investigation. (Dkt. 13 at 4) (citing Dkt. 15, Summers Aff.)[7] Additionally, Mr. Summers points to Laura Scott's testimony stating that the City Council considered their desire to have a better working relationship with Valley County during its deliberations over whether to confirm the termination. (Dkt. 13 at 4.)[8] The Defendants counter that the investigation had "no bearing" on the decision to terminate Mr. Summers; pointing out that Mr. Drabinski did not become the City Manager until after the investigation was complete and the investigation was done with the full knowledge and approval of the City Council. (Dkt. 11 at 9.)

---

[7] In the February 15, 2013 Notice of Intent to Terminate, Mr. Drabinski listed seven basis for his recommendation to the City Council that Mr. Summers be terminated as the Chief of Police. (Dkt. 14-2, Ex. 2 at 33.) Ms. Sivey testified that Mr. Drabinski was responsible for the list of issues that appeared on the February 15, 2013 Notice. (Dkt. 14-5, Sivey Depo. at 87.)

[8] Ms. Scott's testimony was:
Q. Was Jerry's investigation of Sheriff Bolen part of the topic of conversation as to whether he should be terminated or not?
A. It came up. It was not a – it came up a couple of times and the council did generally have a desire to have a better working relationship with the County.
(Dkt. 14-2.)

The Court finds Mr. Summers has pointed to evidence of a genuine issue of material fact as to whether his termination arose from his investigation into the Valley County Sheriff's Office; particularly in light of the second reason stated in the Notice of Proposed Personnel Action which refers to Mr. Summers' strained relationship with the Valley County Sheriff and other agency. (Dkt. 14-2, Ex. 16.)[9] As such, the burden shifts to the Defendants to produce evidence of a non-retaliatory reason for the discharge.

In support of the Motion for Summary Judgment, the Defendants have filed Affidavits of City Council Members Donald Bailey, Laura Scott, Jackie Aymon, Marcia Witte, and Nicolas Swanson which state that in their deliberations over whether or not to confirm the termination of Mr. Summers in 2013, the City Council considered the reasons given by Mr. Drabinski as well as Mr. Summers' rebuttal made in each of their presentations on February 21, 2013. The Affidavits further state that on April 11, 2013 the City Council voted unanimously to confirm Mr. Summers' termination on an at-will, not for cause, basis. (Dkt. 11-6, 11-7, 11-8, 11-9, 11-10.) Each of the City Council members deny that the decision to approve Mr. Summers' termination was based in anyway on the Valley County Sheriff's Office investigation, the filing of a Notice of Tort Claim, the reports of workplace hostility, the reports of Mr. Drabinski's driving violations, and/or the fact that Mr. Summers supported an alternative candidate for the City Manager position. Two of the City Council members stated, albeit using different language, that the reason for the decision came down to the ability of Mr. Summers and Mr. Drabinski to work together. (Dkt. 11- 7, 11-8.) Mr. Bailey

---

[9] The copy of the Notice of Proposed Personnel Action is provided as an attachment to Laura Scott's Deposition. (Dkt. 14-2 at Ex. 16.)

stated he had voted to confirm the termination "based on the reasons given by Mr. Drabinski." (Dkt. 11-6.) Ms. Witte and Mr. Swanson stated the reason for their votes was "because I believed that it was in the best interests of the City to have a change of leadership in the McCall Police Department." (Dkt. 11-9, 11-10.)

In his deposition, Mr. Drabinski testified that he did not know about Mr. Summers' investigation into the Valley County Sheriff's Office until Mr. Summers told him about it and that the investigation had "all happened before he got there." (Dkt. 14-1, Drabinski Depo. at 139.) Mr. Drabinski also denied having told Mr. Summers that the investigation limited his chances for advancement with the City.

When asked to list all of the reasons for his decision to place Mr. Summers on administrative leave and recommend termination Mr. Drabinski stated:

> I lost the will to have him employed, I lost confidence in his ability to the lead the police department, and it was clear to me that he was lacking the support he needed within this community to be able to fulfill it, even if he wanted to.

(Dkt. 14-1, Drabinski Depo. at 212.) Mr. Drabinski pointed to the comments made by Mr. Summers' subordinates as a basis for stating that Mr. Summers had lost the confidence of three of the four of his direct subordinates. (Dkt. 14-1, Drabinski Depo. at 212-218.)[10] Mr. Drabinski also discussed comments from other police officers regarding Mr. Summers. (Dkt. 14-1, Drabinski Depo. at 218-221, 234-45.)

Similarly, in his Affidavit Mr. Drabinski states that he viewed the comments on the evaluation form as negative and in mid-January he "decided it was time to replace" Mr.

---

[10] The Compendium of Comments appeared on the Employee Management Feedback Form. (Dkt. 14-5, Sivey Depo. at 90.)

Summers because he failed to acknowledge his role in creating a negative public perception of the McCall Police Department or work with Mr. Drabinski to improve the perception; he did not work to improve his relationship with the Valley County Sheriff's Office; and he had lost the confidence of the business community as well as his subordinates. (Dkt. 11-3, Drabinski Aff. at ¶¶ 11-12.) Mr. Drabinski also denied that his decision to discharge Mr. Summers had anything to do with the Valley County investigation, filing the Notice of Tort Claim, reporting workplace hostility against Mr. Drabinski, reporting driving violations, and/or the fact that Mr. Summers had supported an alternative candidate for the City Manager position. (Dkt. 11-3, Drabinski Aff. at ¶ 16.)

Laura Scott testified in her deposition that the "crux" of the City Council's discussion regarding Mr. Drabinski's decision to terminate Mr. Summers was whether the two could work together going forward and the general consensus of the City Council was that it was not possible for the two to have an effective working relationship. (Dkt. 14-2, Scott Depo. at 42-43.) Ms. Scott stated that the City Council also discussed other items in deciding whether to approve Mr. Summers' termination but the decision seemed to come back to whether Mr. Summers was the right person for the job. (Dkt. 14-2, Scott Depo. at 50-54.)

Based on the foregoing, the Court finds that the Defendants have provided evidence that the reason for the discharge was Mr. Summers' inability to work with Mr. Drabinski and the need for new leadership at the police department. This evidence is contained in the Affidavits of the City Council members as well as Mr. Drabinski's own deposition testimony and Affidavit noted above. The Court finds this basis for termination to be a legitimate non-

retaliatory reason for termination. Thus, the burden shifts back to Mr. Summers to prove by a preponderance of the evidence that the reason advanced by the Defendants was a pretext for retaliatory conduct. The Court finds Mr. Summer has not met his burden on this claim.

Pretext can be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Dawson v. Entek Intern.*, 630 F.3d 928, 935 (9th Cir. 2011) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)). Only a small amount of direct evidence is needed to defeat summary judgment. *See Knight v. Brown*, 797 F.Supp.2d 1107, 1131 (W.D. Wash. 2011) (citing *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005)). Where the evidence is circumstantial, the employee must provide enough evidence to create a genuine issue of material fact. *Dawson*, 630 F.3d at 936. In considering whether Mr. Summers has shown pretext, the Court has viewed the evidence in the light most favorable to Mr. Summers.

As to any direct evidence of pretext, Mr. Summers has made claims of retaliation in this case. Those claims, however, are not made with regard to the Valley County investigation. The retaliation comments arose with regard to reports of hostile work environment and driving violations made against Mr. Drabinski. Thus, there is no direct evidence of retaliation relating to the Valley County investigation.

As to circumstantial evidence, Mr. Summers has pointed out that in his approximately fifteen years with the McCall police department he had always received good evaluations. (Dkt. 15, Summers Aff. at ¶¶ 3-20.) After Mr. Drabinski was appointed interim and then

permanent City Manager, Mr. Summers received poor performance reviews and a letter of discipline in his personnel file. (Dkt. 15, Summers Aff. at 76.) Mr. Summers further alleges that Mr. Drabinski used his decision to hire an officer who had ran against the Valley County Sheriff as a basis for putting "bad paperwork" in his personnel file was pretext. (Dkt. 15, Summers Aff. at 79-82.) Having reviewed the record and drawing all reasonable inferences in favor of Mr. Summers, the Court finds Mr. Summers has not shown evidence of pretext.

The evidence Mr. Summers points to shows that Mr. Drabinski and Mr. Summers disagreed on matters relating to the McCall Police Department – in particular the survey results, Mr. Summers' execution of his duties, and the public and department's view of Mr. Summers as chief. Each of the City Council Members testified in their depositions that the decision to approve the termination of Mr. Summers was made in large part because of the disagreements between the two which the Court has determined above was a legitimate basis for termination. Further, the Valley County investigation occurred approximately eight months prior to Mr. Drabinski being appointed as interim City Manager and approximately a year before any negative documents were placed in Mr. Summers' personnel file. Thus, the investigation and the alleged retaliation by Mr. Drabinski were not closely related in time.

Based on the foregoing, the Court finds Mr. Summers has failed to show that a genuine issue of material fact exists as to whether the purported reason for the adverse employment actions was pretext for the Defendants' retaliation against Mr. Summers because of the Valley County investigation. Accordingly, the Court will grant the Motion for Summary Judgment on this claim.

## 2.    Notice of Tort Claim Filed Against Valley County

On October 9, 2012, Mr. Summers filed a Notice of Tort Claim against Valley County alleging libel and slander. (Dkt. 17-1, Ex. A.) The tort allegations appear to be related to Mr. Summers' investigation of the Valley County Sheriff's Office. (Dkt. 15, Summers Aff. at ¶ 61.) Mr. Summers states that he filed the Notice only to preserve his right to take legal action in the future against Valley County. (Dkt. 13 at 6); (Dkt. 15, Summers Aff. at ¶¶ 60-61.) Mr. Summers claims that he was retaliated against and/or fired by the City for having filed the tort claim in violation of the IPPEA. (Dkt. 1 at ¶¶ 57-59, 101-06.)

Filing the Notice of Tort Claim, Defendants argue, is not a protected activity under the IPPEA because it seeks compensation for a personal, not public, wrong. (Dkt. 11 at 9.) Moreover, Defendants contend that the filing of the Notice had no bearing on the decision to discharge Mr. Summers. (Dkt. 11 at 10.) The Defendants argue the issue was instead Mr. Summers' failure to inform Mr. Drabinski that he had filed the Notice; not the filing of the Notice itself. (Dkt. 11 at 4) (Dkt. 11, Drabinski Aff. at ¶ 8.) Mr. Summers counters that his filing of the tort claim was a private action of which he was not required to notify Mr. Drabinski. (Dkt. 13 at 5.) Further, Mr. Summers maintains his filing of the tort claim was a protected activity under the IPPEA because it put Valley County on notice of his allegation that its Sheriff's Office had committed the crime of libel against him. (Dkt. 13 at 5-6.)

The Court concludes that Mr. Summers' filing of a Notice of Tort Claim against Valley County was not a protected activity under the IPPEA. Protected activities are described in the IPPEA as:

(1)(a) An employer may not take adverse action against an employee because the employee, or a person authorized to act on behalf of the employee, communicates in good faith the existence of any waste of public funds, property or manpower, or a violation or suspected violation of a law, rule or regulation adopted under the law of this state, a political subdivision of this state or the United States. Such communication shall be made at a time and in a manner which gives the employer reasonable opportunity to correct the waste or violation.

*Van*, 212 P.3d at 988 (quoting Idaho Code § 6–2104). "Protected activities include: (1) opposing an unlawful employment practice; and (2) participating in a statutorily authorized proceeding." *Patterson*, 256 P.3d at 726 (quoting federal EEOC case of a retaliation claim) (citation omitted). A protected activity may arise in several forms such as: "(1) reporting safety violations that potentially violate federal regulations; (2) documenting a waste of public funds and manpower; and (3) communicating a mayor's potential conflict of interest with an employee health plan that could potentially waste public resources." *Black v. Idaho State Police*, 314 P.3d 625, 628 n. 3 (Idaho 2013) (citations omitted).

Any private tort action for libel Mr. Summers may raise against Valley County does not raise the kind of public concerns that the IPPEA contemplates. *Patterson*, 256 P.3d at 724 (The IPPEA is intended to protect public wrongs – the IPPEA "seeks to protect the integrity of the government 'by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation.'"). Instead, Mr. Summers' tort claim for libel seeks personal vindication for actions by Valley County. Libel is defined in Idaho's criminal code as "a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending

to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural or alleged defects, of one who is alive, and thereby to expose him to public hatred, contempt or ridicule." Idaho Code 18-4801; *see also* Black's Law Dictionary, 9th Ed., at 999 (defining libel as a "defamatory statement expressed in a fixed medium...."). "In a defamation action, a plaintiff must prove that the defendant: (1) communicated information concerning the plaintiff to others; (2) that the information was defamatory; and (3) that the plaintiff was damaged because of the communication." *Hopper v. Swinnerton*, 317 P.3d 698, 708 (Idaho 2013) (citation omitted). Thus, the tort claim by Mr. Summers seeks a remedy for the harm to his own reputation. While Mr. Summers' tort claim may relate to the actions of a public entity in response to his investigation, the fact remains that his tort claim does not implicate a matter of public concern. Accordingly, the Court finds the filing of the tort claim was not a protected activity as contemplated by the IPPEA.

Alternatively, had Mr. Summers shown the elements of his IPPEA claim, the Court finds the Defendants have pointed to evidence showing a non-retaliatory reason for Mr. Summers' discharge. Specifically, that the reason for the discharge was not the filing of the tort claim itself but, instead, the fact that Mr. Summers did not notify Mr. Drabinski that he was filing the action. Mr. Drabinski stated in his deposition the issue concerning the Notice was that Mr. Summers needed to inform Mr. Drabinski of his having filed the tort action against the County because, as the City Manager, Mr. Drabinski needed to manage the relationship between the City, the County, and the City Council as well as manage how the City is portrayed in the media. (Dkt. 14-1, Drabinski Depo. at 224.) He testified that his

concerns regarding the tort claim had nothing to do with whether the claim was filed but, instead, Mr. Summers' failure to inform Mr. Drabinski of the fact that he had filed which interfered with Mr. Drabinski's ability to do his job as City Manager. (Dkt. 14-1, Drabinski Depo. at 225.) Ms. Sivey similarly testified in her deposition that Mr. Drabinski drafted a letter of reprimand to be put in Mr. Summers' file stating that Mr. Summers had failed to follow Mr. Drabinski's instructions on keeping him informed of things that might affect his job as City Manager, such as his filing of a suit or tort claim. (Dkt. 14-5, Sivey Depo. at 59-60.) Mr. Drabinski's Affidavit makes the same statement. (Dkt. 11-3, Drabinski Aff. at ¶ 3.)

Regardless of whether or not Mr. Summers was required to tell Mr. Drabinski, the fact that he did not inform Mr. Drabinski also supports the Defendants' position that Mr. Summers was terminated because he and Mr. Drabinski were unable to effectively work together and/or communicate, not because Mr. Summers filed the Notice of Tort Claim. As determined above, this is a legitimate non-retaliatory reason for the discharge. Mr. Summers has not pointed to evidence raising a genuine issue of material fact as to pretext as to this claim. Accordingly, the Court will grant summary judgment on this claim.

### 3. Reporting Workplace Hostility by Mr. Drabinski

Mr. Summers' third claim for relief alleges that he was engaged in a protected activity when he reported Mr. Drabinski's workplace hostility and aggressive physical and intimidating behavior towards himself to the City's Human Resources Manager. (Dkt. 1 at ¶¶ 108-09.) The Defendants took adverse action against him, Mr. Summers' claims, by terminating his employment which was causally connected to his reports. (Dkt. 1 at ¶¶ 110-

11.) Defendants respond that the reporting of workplace hostility and aggression is not a protected activity under IPPEA and, further, that the report had no bearing on the decision to terminate Mr. Summers. (Dkt. 11 at 10.) Mr. Summers counters that the reports concerned conduct meeting the definition of the crime of assault and, therefore, making such a report is a protected activity – i.e. reporting a violation of law. *See* Idaho Code § 6-2104. Further, Mr. Summers argues his termination was causally connected to the protected activity as evidence by Mr. Drabinski's statements that he was going to fire Mr. Summers because of his efforts to keep Mr. Drabinski from becoming the permanent City Manager. (Dkt. 13 at 7-8.)

The primary event giving rise to Mr. Summers' report of workplace hostility/aggression occurred during a September 2012 meeting at the police department where the results of the City's survey were presented. Mr. Summers has provided the depositions of several individuals who were present at the meeting and described Mr. Drabinski's actions towards Mr. Summers as "angry" with "fists clenched," "slightly aggressive," and "hostile." (Dkt. 13 at 6-7 citing Depos. Sandy Ryska, Brian Holbrook, Larry Stokes, Brian Koch.) Some of these individuals testified that Mr. Drabinski took an aggressive stance and moved forward towards Mr. Summers during the meeting.[11] Although

---

[11] Sandy Ryska testified from her written statement that the September meeting Mr. Drabinski became angry and took two steps towards Mr. Summers, took a boxer stance, and began yelling at him with his fists clenched. (Dkt. 14-4, Ryska Depo. at 18.) Ms. Ryska sent her written statement to the City's Human Resources Manager, Barbara Sivey, as a formal complaint against Mr. Drabinski. (Dkt. 14-4, Ryska Depo. at 22-23, 38-39, and Ex. 3.)

Brian Holbrook testified in his deposition that at the September 2012 meeting Mr. Drabinski had an "outburst directed directly toward Chief Summers" which he describes as Mr. Drabinski blowing up, yelling, advancing and pointing fingers at Mr. Summers, and getting red in the face. (Dkt. 14-6, Holbrook Depo. at 16-18 and Ex. 8.) Mr. Holbrook did not, however, fear there would be an altercation. (Dkt. 14-6, Holbrook Depo. at 19-

some who were present stated they did not believe the two would get physical, Mr. Drabinski's conduct was such that two of the individuals as well as Mr. Summers himself reported the incident to the City's Human Resources Department.[12]

Mr. Drabinski's Affidavit couches the events at the September 19, 2012 police department meeting as one example of Mr. Summers' undercutting and obstructionist behavior – i.e. Mr. Summers' failure to "get on the bus" with Mr. Drabinski and the changes the Police Department needed to make. (Dkt. 11-3, Drabinski Aff. at ¶ 19.) Mr. Drabinski testified that Mr. Summers "pushed against the results [of the survey] and pushed against the need to move forward." (Dkt. 14-1, Drabinski Depo. at 151.) Mr. Drabinski stated that he did not get "aggressive" but, instead, that he "got assertive" with Mr. Summers stating "[t]here's only going to be one leader here and that was me." (Dkt. 14-1, Drabinski Depo. 152.) Mr. Drabinski denied having his fists in a ball, squaring off, getting angry, and losing his temper at the meeting.

Barbara Sivey, the City's Human Resources Manager, confirmed that Mr. Summers, Mr. Holbrook, and Ms. Ryska had all spoken to her regarding Mr. Drabinski's conduct at the September 2012 meeting. (Dkt. 14-5, Sivey Depo. at 24-25.) Ms. Sivey considered these

---

20.) Mr. Holbrook also testified that he had reported workplace harassment by Mr. Drabinski towards himself the City's Human Resources Department. (Dkt. 14-6, Holbrook Depo. at 32.)

Detective Brian Koch testified that at the September 2012 meeting Mr. Drabinski was upset and "kind of jumped up and went towards [Mr. Summers]." (Dkt. 14-7, Koch Depo. at 9-13.)

Larry Stokes testified that Mr. Drabinski's general demeanor towards Mr. Summers was "slightly aggressive" or "hostile." (Dkt. 14-8, Stokes Depo. at 14.) Mr. Stokes observed Mr. Drabinski take an "aggressive stance" meaning his fists were balled up and he was leaning forward and speaking in a raised voice directly to Mr. Summers and other members of the department. (Dkt. 14-8, Stokes Depo. at 15-16.)

[12] Peter Rittenger stated at his deposition that he was present at the September 2012 meeting and observed Mr. Drabinski and Mr. Summers were both frustrated and disagreed regarding the topic of the meeting. (Dkt. 14-3, Rittenger Depo. at 13.) He denied that Mr. Drabinski was going to get physical with Mr. Summers. (Dkt. 14-3, Rittenger Depo. at 16.)

reports to be formal complaints. (Dkt. 14-5, Sivey Depo. at 63-65.) In reaction to the comments, Ms. Sivey met with Mr. Drabinski who stated that he raised his voice to Mr. Summers at the meeting in order to be heard. (Dkt. 14-5, Sivey Depo. at 26.) Ms. Sivey also testified that Mr. Summers talked to her at other times about Mr. Drabinski indicating the two did not agree but that Mr. Summers did not ask her to do anything and did not mention "retaliation" until he made his presentation to the City Council in February of 2013. (Dkt. 14-5, Sivey Depo. at 57-58.) Laura Scott's deposition testimony reflects that the City Council was aware of Mr. Summer's claims of retaliation against Mr. Drabinski and noted that no formal investigation had been done. (Dkt. 14-2, Scott Depo. at 39.)

Based on the foregoing, the Court finds Mr. Summers' report of the hostile conduct by Mr. Drabinski was a protected activity. The Idaho Supreme Court has interpreted the IPPEA's provisions broadly when considering what constitutes a protected activity. *See Curlee*, 224 P.3d at 465-67. Mr. Summers' report to the City concerned the conduct of its interim City Manager that many who were present described as hostile and/or aggressive. As such, the report communicates the existence of a violation or suspected violation of a law, rule, or regulation. *See* Idaho Code § 6-2104(1)(a). Further, given the timing and the circumstances between the protected activity and Mr. Summers' termination, the Court finds a genuine issue of material fact has been shown that the termination may have been causally connected to the protected activity.

As stated above, the Court has found that Defendants have shown a legitimate non-retaliatory basis for the adverse action. Thus, the burden shifts back to Mr. Summers to show

pretext. Here, the Court finds that Mr. Summers has pointed to evidence giving rise to a genuine issue of material fact that his termination may have been pretextual. In particular, the deposition testimony of Mr. Summers and others who were present at the September 2012 meeting that expressed their concerns of retaliation by Mr. Drabinski. (Dkt. 14-4, 14-6, 14-7.) In relation to the hostile workplace reports, Ms. Ryska stated in her deposition that Mr. Drabinski had told her that he was going to fire Mr. Summers because he was trying to keep him from becoming the city manager and Mr. Koch's testimony that Mr. Drabinski had stated there was a "conspiracy in the police department to keep him from becoming the city manager." (Dkt. 14-4, Ryska Depo.) (Dkt. 14-7, Koch Depo. at 21.) Because Mr. Summers has pointed to evidence giving rise to a genuine issue of material fact, the Court denies the Motion for Summary Judgment as to this claim. In reaching this conclusion, the Court makes no findings as to whether either side will prevail at trial on their respective arguments on this claim.

### 4. Reporting Mr. Drabinski's Driving Violations

In the fourth claim for relief, Mr. Summers alleges he engaged in a protected activity by reporting to the City's Human Resources Manager and City Council that Mr. Drabinski was driving in violation of Idaho law. (Dkt. 1 at ¶¶ 115-16.) The Defendants took adverse action against Mr. Summers, he claims, by terminating his employment which was causally connected to the protected activity. (Dkt. 1 at ¶¶ 118-119.) In response, Defendants agree that Mr. Summers' reports of Mr. Drabinski's driving violations were protected activities but argue the reports had "no bearing" on the decision to discharge Mr. Summers. (Dkt. 11 at

10.) Mr. Summers points to statements made by Ms. Ryska and Mr. Koch to establish the causal connection between his reports and his termination. (Dkt. 13 at 8.) In particular, that Mr. Summers' report was perceived as an attempt to prevent Mr. Drabinski from being appointed as the permanent City Manager.

The Court finds Mr. Summers has provided evidence that his termination may have been causally connected to the reports of Mr. Drabinski's driving violations. The reports of driving violations were made in September and October of 2012, just prior to Mr. Drabinski being appointed to the permanent City Manager position. The deposition testimony of Mr. Koch and Ms. Ryska give rise to a genuine issue of material fact that Mr. Summers' termination may have been caused by the driving violation reports.

Again, the Court has determined above that the Defendants have shown a non-retaliatory reason for terminating Mr. Summers. Thus, the burden shifts to Mr. Summers to show pretext. On this claim, the Court finds that Mr. Summers has pointed to evidence which, if true could show that the basis for his termination was pretextual.

Mr. Koch stated that he observed Mr. Drabinski driving twice while his license was revoked and reported both instances to Mr. Summers. (Dkt. 14-7, Koch Depo. at 14-15.) Mr. Koch testified that he believed Mr. Summers had been suspended, at least in part, because of the driving license issue and he too feared retaliation from Mr. Drabinski for having reported the driving violation. (Dkt. 14-7, Koch Depo. at 18-23.) Ms. Ryska testified that Mr. Drabinski had told her that he was going to fire Mr. Summers because he was trying to keep him from becoming the city manager. (Dkt. 14-4, Ryska Depo.) Similarly, Mr. Koch sent an

email to Mr. Summer stating that Mr. Drabinski had said there was a "conspiracy in the police department to keep him from becoming the city manager." (Dkt. 14-7, Koch Depo. at 21.)[13]

Based on the foregoing, the Court finds genuine issues of material fact exist as to this claim and, therefore, the Motion for Summary Judgment is denied.

### B.     Section 1983 claims

Section 1983 provides a cause of action for violations of a plaintiff's constitutional or other federal rights by persons acting under color of state law. *Nurre v. Whitehead*, 580 F.3d 1087, 1092 (9th Cir. 2009). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citation omitted). To prevail on the § 1983 claims, Mr. Summers must show that (1) acts by the Defendants, (2) under color of state law, (3) deprived him of federal rights, privileges or immunities, and (4) causing damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163–64 (9th Cir. 2005) (quoting *Shoshone–Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)).

### 1.     Deprivation of Property Interest - Due Process

The Fourteenth Amendment to the United States Constitution protects individuals from the deprivation of liberty or property by the government without due process. A § 1983 claim based upon procedural due process contains three elements: (1) a liberty or property

---

[13] This email is dated February 1, 2013. (Dkt. 14, Ex. 11.) In Mr. Koch's deposition testimony taken on December 30, 2013 he stated he did not recall sending the email to Mr. Summers. (Dkt. 14-7, Koch Depo. at 21.)

interest protected by the United States Constitution; (2) a deprivation of that interest by the government; and (3) a denial of adequate procedural protections. *See Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). To state a claim under the Due Process Clause, Mr. Summers must first establish that he possessed a constitutionally protected property interest. *See Brewster v. Board of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). Where a property interest exists, due process requires notice and an opportunity to respond. *See Cleveland Bd. of Educ. v. Loundermill et al.*, 470 U.S. 532, 546 (1985). The Due Process Clause does not itself create substantive property rights; property rights are defined instead by reference to state law. *See Portman*, 995 F.2d at 904.

The sixth claim for relief alleges the Defendants violated Mr. Summers' Fourteenth Amendment rights by depriving him of a property interest – his reasonable expectation in continued employment – without due process of law and his termination was contrary to the conditions of his employment with the City. (Dkt. 1 at ¶¶ 133-140.) Defendants argue that Mr. Summers was an at-will employee and, as such, he did not have a federally protected property interest in continued employment. (Dkt. 11 at 11.) Mr. Summers maintains that his property interest arises from either the implied covenant of good faith and fair dealing and/or the public policy exception to the employment at-will relationship. (Dkt. 13 at 8-10).

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it...more than a unilateral expectation of it. [The person] must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see also Sonoda v. Cabrera*, 255 F.3d 1035, 1040 (9th Cir.

2001) ("An individual 'has a constitutionally protected property interest in continued employment ... if he has a reasonable expectation or a 'legitimate claim of entitlement' to it, rather than a mere 'unilateral expectation.'") (citation omitted). "Under Idaho law, unless an employee is hired pursuant to a contract which specifies the duration of the employment, or limits the reasons why the employee may be discharged, the employee is at will." *Venable v. Internet Auto Rent & Sales, Inc.*, 329 P.3d 356, 360 (Idaho 2014) (quotation marks and citations omitted). "An at-will employee may be terminated by his or her 'employer at any time for any reason without creating liability.'" *Id.* (quoting *Edmondson v. Shearer Lumber Products*, 75 P.3d 733, 737 (Idaho 2003)).

At-will employment "is not, however, an absolute bar to a claim of wrongful discharge." *Venable*, 329 P.3d at 361 (citation omitted). Idaho recognizes "a narrow exception to the at-will employment presumption where the employer's motivation for the termination contravenes public policy." *Id.* (quoting *Bollinger v. Fall River Rural Elec. Co-op., Inc.*, 272 P.3d 1263, 1271 (Idaho 2012)). "A termination contravenes public policy 'only where an employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights and privileges.'" *Id.* In such instances, the employee has a claim for wrongful discharge.

The parties appear to agree that Mr. Summers' employment was at-will. The dispute here is over whether either Idaho's public policy exception or the implied covenant give rise to a property interest. The Court finds neither basis gives rise to a property interest here.

Mr. Summers argues the public policy exception applies based on his IPPEA claims of unlawful retaliation as well as the implied covenant. (Dkt. 13 at 9.) The Defendants counter arguing that the public policy exception does not give rise to a protected property interest in this case. (Dkt. 17 at 5.) Several cases from other districts have rejected Mr. Summers' argument in this regard. *See Harrison v. Owens*, No. 8:11-2215-MGL, 2014 WL 3101266, at *7 (D.S.C. 2014); *Bennett v. Watters*, 260 F.3d 925, 929 (8th Cir. 2001); *Campbell v. Purtle*, 184 F.3d 991, 993 n. 3 (8th Cir. 1999) (citing cases); *Reitz v. Persing*, 831 F.Supp. 410, 414-15 (M.D.Pa. 1993). This Court has reviewed these decisions and is in agreement with their reasoning and conclusions that the public policy exception does not give rise to a protected property interest in continued employment in this case.

Likewise, the implied covenant is not the source of a protected property interest. The implied covenant of good faith and fair dealing applies to at-will employment and affords an employee the right to be dealt with fairly and in good faith. *See Cantwell v. City of Boise*, 191 P.3d 205, 213-14 (Idaho 2008). Breach of the covenant may give rise to an action for wrongful termination but it does not convert at-will employment to term employment nor form the basis for a protected property interest. *See Hollister v. Forsythe*, 22 F.3d 950, 952-52 (9th Cir. 1994) (holding an implied covenant of good faith and fair dealing was insufficient to create a property interest in continued employment under Montana's statutory scheme for at will employment); *Willnerd v. Sybase, Inc.*, No. 1:09-cv-500-BLW, 2011 WL 2710085, at *3-5 (D. Idaho 2011) (the implied covenant does not alter the employee's at will employment status). Because Mr. Summers has not shown a property interest, the Court will

grant the Motion for Summary Judgment as to this claim.

Alternatively, if a protected property interest were found to exist, the Defendants argue that Mr. Summers was provided due process. (Dkt. 11 at 12.) Mr. Summers contends that the process afforded to him was a "sham" because the City failed to investigate his claims of unlawful retaliation before "rubber stamping" his termination. (Dkt. 13 at 10-11.)

"When a state has conferred a property interest in employment, the Due Process Clause prevents the deprivation of such an interest without appropriate procedural safeguards, including notice and an opportunity to be heard." *Cantwell*, 191 P.3d at 214 (citations omitted). "Due process requires that, prior to termination, an employee must be given (a) oral or written notice of the reason(s) for the termination, (b) an explanation of the employer's evidence, and (c) an opportunity to present his or her side of the story. There does not need to be a full-blown evidentiary hearing prior to the termination, so long as one may be had after the termination." *Id.*

In this case, it is undisputed that the City provided Mr. Summers with a written notice of the proposed action, written notice of the specific reasons for the proposed action, and an opportunity to be heard. Mr. Summers was allowed to rebut the reasons for the proposed action and present his position at the February 21, 2013 City Council session. The City Council then discussed whether to approve the proposed action and terminate Mr. Summers in three separate sessions. The Court finds the City's procedure used here satisfies due process in this case. Mr. Summers' argument that the City should have done more to investigate his claims of retaliation shows that he disagrees with the process and outcome but

it does not show that the City failed to satisfy the essential due process demands of notice and an opportunity to be heard. The Court finds the requirements of due process were met here and summary judgment is granted on this claim.

### 2.      Deprivation of Liberty Interest

The eighth claim for relief alleges the Defendants infringed upon Mr. Summers' liberty interests in his good name and reputation and in continued and future employment when they terminated him and made false allegations of unsatisfactory job performance. (Dkt. 1 at ¶¶ 149-155.) As a result of the false allegations of unsatisfactory job performance in his personnel file, Mr. Summers' contends a stigma has been placed on his professional reputation and his future employment opportunities within his chosen profession have been adversely impacted and/or foreclosed. Mr. Summers claims he has been forced to retire from his chosen profession as police chief at the age of 54 and seek employment in a new field outside of law enforcement where he had worked for nearly 16 years.

The Fourteenth Amendment guarantees individuals the right to procedural due process when "a constitutionally protected property or liberty interest is at stake." *King v. Garfield Cnty. Public Hospital, Dist. No. 1*, 17 F.Supp.3d 1060, 1076 (E.D. Wash. 2014). "The government may not deprive a person of the freedom 'to engage in any of the common occupations of life' without due process." *Minshew v. Donley*, 911 F.Supp.2d 1043, 1064 (D. Nev. 2012) (quoting *Board of Regents*, 408 U.S. at 572–73). "A 'public employer can violate an employee's rights by terminating the employee if in so doing, the employer makes a charge 'that might seriously damage [the terminated employee's] standing and associations

in his community' or 'impose[s] on [a terminated employee] a stigma or other disability that foreclose[s] his freedom to take advantage of other opportunities.'" *Blantz v. California Dept. of Rehabilitation and Corrections*, 727 F.3d 917, 925 n. 6 (9th Cir. 2013) (quoting *Tibbetts v. Kulongoski*, 567 F.3d 529, 536 (9th Cir. 2009) (alterations in original) (quoting *Board of Regents*, 408 U.S. at 573)). Due process protections are required where the state seeks to forever bar "an individual from public employment, makes a charge of 'dishonesty,' or attaches a 'stigma' to an employment decision...." *King*, 17 F.Supp.3d at 1076 (quoting *Board of Regents*, 408 U.S. at 564).

"To establish a due process violation, a plaintiff must show (1) the government publicly disclosed a stigmatizing statement during the course of terminating the plaintiff or altering some other right or status recognized by state law, (2) the plaintiff contests the accuracy of that statement, and (3) the government's denial of some other interest, such as discharge from employment or alteration or extinguishment of some other legal right or status." *Minshew*, 911 F.Supp.2d at 1064 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

Defendants argue this claim fails because Mr. Summers has not established that his future employment is foreclosed, the materials placed in his personnel file do not amount to a publication, several of the allegations do not involve public disclosure by the Defendants, and the allegations were not stigmatizing and/or false. (Dkt. 17 at 6-8.) Alternatively, the Defendants argue that even if a liberty interest is found, Mr. Summers was afforded his right to due process. (Dkt. 17 at 8.) Mr. Summers maintains that he has been "completely foreclosed from employment opportunities as a chief of police" from multiple law

enforcement jobs, Mr. Drabinski's false accusations of performance issues and placing those accusations in Mr. Summers' personnel file were done deliberately to destroy future employment opportunities, Mr. Drabinski made public statements falsely alleging poor performance by Mr. Summers, and the process afforded to Mr. Summers was a "sham." (Dkt. 13 at 11-16.)

For purposes of this Motion, the Court finds that the second and third elements of the due process violation are present in this case – Mr. Summer contests the accuracy of the statements and the City has terminated Mr. Summers. The questions on this Motion then are whether there is a genuine issue of material fact as to whether the statements/accusations were stigmatizing and/or false and, if so, whether Mr. Summers was afforded due process.

## A.     Stigmatizing Statements

"A statement is sufficiently stigmatizing if the government discloses the plaintiff's dismissal was for 'reasons that might seriously damage [the plaintiff's] standing in the community,' or if it 'effectively precludes future work in the individual's chosen profession.'" *Minshew*, 911 F.Supp.2d at 1064 (quoting *Merritt v. Mackey*, 827 F.2d 1368, 1373 (9th Cir. 1987) (quotation and internal citation omitted)). "Accusations of dishonesty or immorality are sufficiently stigmatizing to implicate a liberty interest, but less severe accusations must be analyzed on a case-by-case basis, and allegations of mere incompetence or inability are not sufficient." *Blantz*, 727 F.3d at 925. "[M]ere harm to reputation alone is insufficient to implicate an individual's liberty interest." *King*, 17 F.Supp.3d at 1076 (citation omitted). "[W]here ... there is no charge of dishonesty or immorality, no serious damage to

[the plaintiff's] standing and associations in the community can be shown." *Minshew*, 911 F.Supp.2d at 1064 (quoting *Debose v. U.S. Dep't of Agric.*, 700 F.2d 1262, 1266 (9th Cir. 1983)). "[C]harges of substandard performance ... do not rise to the level necessary to infringe a liberty interest, thereby triggering constitutionally mandated procedural due process protections." *Id.* "Additionally, the allegedly stigmatizing statement must not be too remote in time from the termination." *Id.* (citing *Campanelli v. Bockrath*, 100 F.3d 1476, 1483 (9th Cir.1996)).

Mr. Summers claims the Defendants made untruthful and false accusations against him concerning performance issues, persistent constitutional violations at the Police Department, and the results of the survey. (Dkt 13 at 13-14) (Dkt. 15, Summers Aff.)

As to the allegations that the documents placed in his personnel file contained false information and accusations of performance issues, even if that is the case, because the allegedly false accusations related to Mr. Summers' performance they do not give rise to the kind of stigmatizing allegations that implicate a liberty interest. *See Blantz*, 727 F.3d at 925 n. 6. The materials contained in his personnel file and accusations made in the Notice of Proposed Personnel Action that Mr. Summers claims are false concern claims of "poor performance" and performance based deficiencies. (Dkt. 1 at ¶¶ 86-87), (Dkt. 15, Summers Aff. at ¶¶ 76-77), and (Dkt. 1 at ¶ 82) ("Mr. Drabinski did in fact allege Mr. Summers was deficient in his performance in...[the] February 15, 2013, notice of personnel action. The allegations of Mr. Summers's deficient performance were false."); (Dkt. 14-2, Ex. B, Notice of Proposed Personnel Action.) The Court finds that to the extent the accusations are purely

performance based claims, and do not implicate dishonesty or immorality, they are not sufficiently stigmatizing to give rise to a protected liberty interest.

Mr. Summers' argues at length that Mr. Drabinski was intentionally trying to destroy his career as a police chief and used false performance allegations as a pretext for retaliation. (Dkt. 13 at 11-14.) Even if Mr. Drabinski's subjective intent was retaliation and to terminate Mr. Summers as police chief, that fact does not turn the accusations made concerning performance issues into a protected liberty interest. As discussed elsewhere in this Order, however, Mr. Drabinski's alleged retaliation may go to show pretext in other contexts.

To the extent the alleged comments concern complaints about and constitutional violations by the Police Department, Mr. Summers argues these claims are not just performance issues but are instead fatal to individuals working in law enforcement. (Dkt. 13 at 14.) These allegations include arguments concerning the results of the survey conducted by Mr. Drabinski wherein the chief complaints about the Police Department were: the City had too many police officers, the police officers made too many stops, and the police officers were too aggressive. (Dkt. 13 at 14.)

The Court finds a genuine issue of material fact exists as to whether or not these allegations implicate dishonesty or immorality such that they were "stigmatizing" so as to give rise to a protectable liberty interest. Mr. Summers has raised arguments concerning his search for other chief of police positions which, if true, could be found to show he has been completely foreclosed from obtaining employment in his chosen profession. During the survey, Mr. Summers alleges that Mr. Drabinski repeatedly and publicly solicited negative

complaints without regard for whether the complaints had been properly investigated, addressed, or were well founded. (Dkt. 15, Summers Aff. at ¶¶ 50-56.) Mr. Summers challenges the reliability and accuracy of the survey as well as the comments solicited by Mr. Drabinski arguing that the majority of the responses were "overwhelmingly positive." (Dkt. 15, Summers Aff. at ¶ 47.)

While it seems that these accusations could go to Mr. Summers' performance, the Court finds that Mr. Summers has, at lease on this Motion, pointed to evidence giving rise to a genuine issue of material fact as to whether these allegations are sufficiently stigmatizing. For instance, the accusations made based on the public complaints and/or survey could implicate Mr. Summers' dishonesty and immorality and/or whether the police department violated the constitution. If this is shown, Mr. Summers may be able to prove the accusations precluded his future work in law enforcement such that he had a protectable liberty interest. For that reason, the Court finds a question of fact exists as to whether the survey and/or complaints about the police department attributed to Mr. Summers were sufficiently stigmatizing accusations.

### B. Due Process Hearing

"[A] terminated employee has a constitutionally based liberty interest in clearing his name when stigmatizing information regarding the reasons for the termination is publicly disclosed." *Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004). "Failure to provide a 'name-clearing' hearing in such a circumstance is a violation of the Fourteenth Amendment's due process clause." *Id.* "[W]here a person's good name, reputation, honor, or integrity is at

stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Board of Regents of State Colleges*, 408 U.S. at 573 (internal quotation and citation omitted).

Mr. Summers argues the hearing held with the City Council was a "sham" because he consistently and persistently notified the City that he was the victim of unlawful retaliation and the City failed to conduct any investigation into his claims prior to the hearing or his termination. (Dkt. 13 at 10, 13) (Dkt. 15, Summers Aff. at ¶¶ 83-107.) Additionally, Mr. Summers claims Mr. Drabinski solicited unreliable negative public comments regarding the Police Department and then pinned the blame for those complaints on Mr. Summers while refusing to allow Mr. Summers to publicly address the complaints against the department in the media. (Dkt. 13 at 13-14.)

As discussed above, the Court finds Mr. Summers was afforded due process when he was allowed to rebut the reasons for the proposed termination and present his arguments at the February 21, 2013 hearing before the City Council. Mr. Summers was given written notice of the proposed employment action and the basis for the proposed action, was confronted with Mr. Drabinski's arguments in favor of the proposed action, and allowed to rebut the claims and present his own arguments to the City Council. *See e.g.* (Dkt. 1 at ¶ 84) ("Mr. Summers was given the opportunity to refute the allegations made by Mr. Drabinski, and in fact did so."); (Dkt. 15, Summers Aff. at ¶ 117) ("During this hearing I took the opportunity to rebut every allegation for which any example or basis for my termination was given.") Both sides acknowledge that Mr. Summers did not request a name clearing hearing.

(Dkt. 11 at 16) (Dkt. 13 at 15) (Dkt. 15, Summers Aff. at ¶ 127.) The Court again finds this process was sufficient to satisfy due process and, therefore, the Motion for Summary Judgement is granted on this claim.

### 3. Deprivation of Property Interest - Free Speech

Mr. Summers' tenth claim for relief alleges he had a property interest in his employment and a reasonable expectation in his continued employment with the City. (Dkt. 1 at ¶ 163.) His employment was terminated, Mr. Summers alleges, based on his exercise of his First Amendment right to engage in political speech as a private citizen on a matter of public concern. (Dkt. 1 at ¶¶ 165-169.) Specifically, Mr. Summers' open support for a candidate other than Mr. Drabinski for appointment to the City Manager position. (Dkt. 1 at ¶¶ 167-169.)

Defendants argue this claim fails under both the due process clause and the First Amendment because his support of a different candidate had no bearing on the decision to terminate. (Dkt. 11 at 17.) Additionally, Defendants argue the policymaker exception precludes his claim because public officials who are "policymakers," such as Mr. Summers was as the Police Chief, may be discharged for exercising political speech.

Mr. Summers counters arguing that he was not a policymaker because the City of McCall utilizes a city manager form of government. (Dkt. 13 at 17.) In this system, the City Manager is directly responsible to the City Council for the policies of the police department unless they are delegated to the chief of police, which Mr. Summers claims was not done in this case. Mr. Summers argues he possessed no authority to make policy or any discretion

regarding policy. Defendants maintain Mr. Summers was a policymaker because it was necessary for him to work closely with, support, and have an effective relationship with Mr. Drabinski in order for Mr. Summers to effectively perform his job. (Dkt. 17 at 9.)

The Court finds a genuine issue of material fact has been shown as to whether Mr. Summers' was terminated because of his support for another City Manager candidate. On the one hand, Mr. Drabinski testified that "it made no difference to me who [Mr. Summers] supported" for the City Manager position and that given their history he would have expected Mr. Summers to support Carol Brockman. (Dkt. 14-1 at 192.) On the other hand, Sandy Ryska testified that Mr. Drabinski had told her in a meeting that "Chief Summers had done everything in his power to keep him from being hired as city manager, and because of that, he was going – his intent was is to have him fired." (Dkt. 14-4, Ryska Depo. at 31, 36.) These contradictory statements give rise to a genuine issue of material fact as to the basis for Mr. Summers' termination.

As to the policymaker exception argument, the First Amendment protects a public employee from being fired or retaliated against based on his or her political opinions, memberships, or activities. *Hunt v. County of Orange*, 672 F.3d 606, 611 (9th Cir. 2012) (citing *Branti v. Finkel*, 445 U.S. 507, 515-16 (1980)). The Supreme Court has delineated a narrow exception to this rule "permitting dismissals on the basis of political beliefs of those employees in 'policymaking positions.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 367 (1976)). This policymaker exception was created so that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration,

policies presumably sanctioned by the electorate." *Id.* In determining whether one is a "policymaker" the Court must determine "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* (quoting *Branti*, 445 U.S. at 518). In resolving this issue, the Ninth Circuit has articulated nine nonexclusive factors for courts to consider including: "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Fazio v. City and Cnty. of San Francisco*, 125 F.3d 1328, 1334 n. 5 (9th Cir. 1997). The Court will take each factor in turn.

There is no dispute that Mr. Summers was the second highest paid City employee. This factor weighs in favor of Defendants.

As to Mr. Summers' responsibilities and duties, this factor is somewhat inconclusive as the parties dispute the applicable facts. Defendants assert that Mr. Summers' duties included: enforcing all laws and regulations, determining whether to seek prosecution for violations of law, serving as the executive officer over the police department, being responsible for the conduct and discipline of the officers in the department, representing the City and the police department in the public, preparing and presenting reports to the City Manager and City Council, making personnel decisions, consulting with the City Manager in formulating policies and regulations and implementing City Council directives, and

preparing and overseeing the department budget. (Dkt. 11 at 18.)[14] Defendants further argue that Mr. Summers' own Affidavit demonstrates the importance of the need for the Police Chief and the City Manager to work closely together in order to effectively perform their jobs as evidence that he was a policy maker. (Dkt. 17 at 9.)

Mr. Summers, however, claims he was not allowed to perform a number of these duties such as: speaking to the press without permission, organizing the police department, choosing which staff members occupied supervisor positions, setting the staff schedule, hiring/firing without approval, representing the City, spending more than $500 without approval, and delegating tasks. (Dkt. 13 at 17.) Additionally, Mr. Summers states he was not consulted or allowed to give input on policies and ordered only to implement policies, was not allowed to drive his personal vehicle to work unless in uniform, and could not determine the appropriate attire for the Chief of Police position. As to the budget, Mr. Summers claims

---

[14] In contrast, the City Code lists the City Manager's powers and duties as applicable here include:

(A) Have general supervision over the business of the city.

(B) See that the ordinances and policies of the city are complied with and faithfully executed.

(C) Attend all meetings of the council at which the city manager's attendance is required by that body.

(D) Recommend for adoption to the council such measures as the city manager may deem necessary or expedient.

(E) Make the appointment of all department heads, subject to confirmation of such appointment by the council and such civil service regulations as may relate thereto; provided, however, that the city attorney shall be excluded from the scope of the city manager's appointment, termination and supervisory authority. The city attorney shall report directly to council; however the services and facilities of the city attorney shall be made available to the city manager and, under guidelines of the city manager, to the officers, department heads and staff of the city as to city business.

(F) Prepare and submit to the council such reports as may be required by that body or as the city manager may deem advisable.

(G) Keep the council fully advised of the financial condition of the city and its future needs.

(H) Prepare and submit to the council a tentative budget for the next fiscal year.

(I) Perform such other duties as the council may establish by ordinance or resolution.

(J) Terminate a department head's appointment , subject to confirmation of such termination by the council and such civil service regulations as may relate thereto.

(Dkt. 11-5, Wagner Aff., Ex. B.)

**MEMORANDUM DECISION AND ORDER - 41**

he prepared the police department's budget but that it was subject to approval and editing by the City Manager before being submitted to the City Council for its approval. In reply, the Defendants maintain that Mr. Summers was a policymaker because it was necessary for him to support and have a working relationship with Mr. Drabinski in order to effectively run the police department. (Dkt. 17 at 9.)

In the City's organizational structure, the Police Chief is a department head responsible for the City's police department. (Dkt. 11-5, Wagner Aff. Ex. B.)[15] The McCall City Code describes the duties for the Police Chief as:

> The chief of police shall be chief of the police force and all full time or reserve police officers shall be subordinate to the chief and subject to the chiefs orders. It shall be the chiefs duty to cause the public peace to be preserved and to see that all laws and provisions of this code are enforced within the city limits. The chief, and through the chief, the police department, have the responsibilities stated in section 5-1-020 of this code. (Ord. 895, 2-9-2012)

(Dkt. 11-5, Wagner Aff. Ex. B.) The City's job description for the Chief of Police states:

> **General Statement of Duties**
> Performs a variety of complex administrative, supervisory, and professional work in planning and directing the programs and activities of the Police Department in the enforcement of laws and ordinances and the prevention of crime and protection of life and property; performs related work as required.
>
> **Classification Summary**
> The principal function of an employee in this class is to serve as executive officer of the City Police Department with the responsibility of planning and directing all the functions, activities and operations of the Department. This position is responsible for the protection of lives and property in the City through the supervision and direction of all police functions. The work is performed under the direct supervision of the City Manager, but considerable latitude is granted for the exercise of independent judgment and initiative.

---

[15] The City's management structure utilizes ten departments with department heads to administer the efficient operations of the City's business. (Dkt. 11-5, Wagner Aff. Ex. B.)

Direct and indirect supervision is exercised over the work of all police department employees. The principal duties of this class are performed in both a general office environment and an outdoor environment that may include exposure to adverse weather conditions and to potential personal danger.

(Dkt. 11-5, Wagner Aff., Ex. C.) The job description goes on to provide illustrative examples of essential duties and responsibilities of the Chief of Police that includes several broad duties ranging from developing and implementing policies and programs, overseeing the department's budget, consulting with the City Manager to formulate policies and regulations and implementing City Council directives governing the activities of the police department, directing and making personnel decisions, providing leadership, representing the City and the police department to the public, presenting reports to the City Manager and the City Council, planing and directing long-range department activities, and ensuring appropriate department cooperation and coordination with other local, state, and federal law enforcement agencies. (Dkt. 11-5, Wagner Aff., Ex. C.)[16]

---

[16] The City's job description for the Chief of Police lists the following illustrative examples: developing and implementing objectives, plans, programs, policies, activities, and operations for the police department; prepares and oversees the police department budget, develops fiscal responsible strategies; consults with the City Manager in formulating policies and regulations and implementing City Council directives governing the activities of the police department; directs the selection, supervision, evaluation, and assignments of Department personnel; provides leadership and encourages leadership in management and supervisory personnel; represents the City and Police Department in maintaining liaison with civic, business, community, and professional organizations; evaluates trends in criminal activities and formulates a department response; Develops leadership skills in police officers and civilian employees to assist them in interaction and problem solving efforts with the community; Works with the Administrative staff of the Department to manage and make decisions on personnel issues, the development of employees in their positions, as well as the development of supervisors and managers in supervision and leadership principles and actions; Conducts sensitive investigations into allegations of official misconduct or violations of law by public officials, employees, or police officers and conducts or arranges for internal affairs investigations as required; Holds all employees accountable for their actions and conduct and administers discipline in accordance with Department and City Employee policies and procedures; Develops policies and procedures to administer, document, and evaluate the activities of all divisions and bureaus of the Department; Meets with supervisors on a regular basis to discuss issues of management and Department policy, and makes changes as necessary; Plans and directs the long-term Police Department

Based on the foregoing, although a close question, the Court finds these broad and vague descriptions of the Police Chief's responsibilities and duties tips slightly in favor of finding Mr. Summers to have been a policymaker. Even accepting as true Mr. Summers' allegations that much of his authority was subject to review or approval, the fact remains that as Police Chief Mr. Summers was in charge of running the City's police department. *Bardzik v. City of Orange*, 635 F.3d 1138, 1147 (9th Cir. 2011) (citing *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 996 (9th Cir. 1999)). His duties in that position included discussing, developing, and implementing City policies applicable to the police department. These broad and general duties included policymaking functions even though he was subject to approval from the City Manager and City Council. *Id.*

These same arguments go also to the "most critical factor" in this determination – influence on programs. *See Walker v. City of Lakewood*, 272 F.3d 1114, 1133 (9th Cir. 2001). Again accepting as true Mr. Summers' allegations that he was required to get approval for many of the duties he was assigned, the record also shows that Mr. Summers took part in the discussions regarding policies for the City's police department and was charged with implementing those policies. *Bardzik*, 635 F.3d at 1147 (citing *Biggs*, 189 F.3d 996). In his

administrative, operational, support, public education, and public relations activities; Develops service related issue plans for forecasting long range police operational and capital improvement needs and presents reports to City Manager; Develops and manages Department policies, procedures, directives, and general orders; Prepares and presents periodic reports on Department activities to the City Manager and City Council; Represents the City and Department at conferences and meetings to stay current on trends in the law enforcement field and represents the City at a variety of local, area, state, and other meetings; Ensures appropriate Department cooperation and coordination with other local, state, and federal law enforcement agencies; Performs all work duties and activities in accordance with City and Department policies, procedures and safety practices.

(Dkt. 11-5, Wagner Aff., Ex. C.)

**MEMORANDUM DECISION AND ORDER - 44**

Affidavit, Mr. Summers states that he was a "driving force in re-establishing the interagency drug task force for Valley County" and was a prominent player in the Child Abduction Response Team, a multi-agency team that produced protocols and attended training designed to work cooperatively with other agencies in a child abduction situation. (Dkt. 15 at 3.)[17] Because he had influence on the police department programs and policies, the Court finds that this factor weighs in favor of finding that Mr. Summers was a policymaker.

The public-perception factor also weighs in the Defendant's favor. As Police Chief, Mr. Summers was well known and visible to the public as the leader of the police department. The job description for the Police Chief position and many of the illustrative duties evidence that the position is responsible, at least in part, for representing the City and the police department to the public. Although Mr. Summers maintains that he was not allowed to speak to the press without permission, the fact that his discretion was somewhat subject to approval does not negate the fact that his position as Chief of Police was highly visible and known to the public and his duties included representing the City as the Chief of Police.

Mr. Summers' own allegations demonstrate that he had the technical competence to serve as the Chief of Police. In his Affidavit, Mr. Summers details his length of service with the police department, from 1997 to 2013, and states he "rose through the ranks" and held "nearly every sworn position in the McCall Police Department." (Dkt, 15 at ¶¶ 3-4.) Mr. Summers goes on to state that his evaluations were always good and he was consistently and

---

[17] The Court notes that these programs occurred prior to Mr. Drabinski becoming the City Manager. Regardless, they still go to show Mr. Summers' influence on programs while he was Chief of Police.

quickly promoted in the department over the years. Upon becoming Police Chief, Mr. Summers states he took the department "from a dysfunctional and unethical department to one that was highly functioning and respected," prior to Mr. Drabinski becoming City Manager he received positive employee evaluations and raises, improved relations with surrounding agencies, and was influential in bringing about important programs in the area. (Dkt. 15 at 3.) Based on Mr. Summers' own affirmations, the Court finds this factor favors the Defendants.

The Court also finds Mr. Summers had the power to control others. Although Mr. Summers argues his discretion regarding certain personnel decisions was subject to approval from the City Manager, as Police Chief, Mr. Summers was clearly in charge of and supervised several individuals ranging from police personnel to staff. This factor too favors the Defendants.

The record here is unclear as to Mr. Summers' authority to speak in the name of policymakers. The written duties of the Police Chief include that Mr. Summers represented the City and Police Department in maintaining liaison with civic, business, community, and professional organizations. Again, Mr. Summers contends that he was not allowed to represent the City without approval. (Dkt. 13 at 17.) Whether Mr. Summers was allowed to represent the City after Mr. Drabinski became City Manager is a genuinely disputed issue of material fact in this case. As such, the Court finds this factor must be weighed in Mr. Summers' favor.

As to the factor concerning responsiveness to political leaders and partisan politics, the Court finds this consideration also favors the Defendants. As Police Chief, Mr. Summers was the department head in charge of implementation of policy and directly accountable to both the City Manager and the City Council for doing so. Further, the City Council had the ultimate hiring and firing decision for the position – i.e. the City Manager appoints department heads and recommends terminations and the City Council confirms appointments and approves terminations. (Dkt. 11-5, Wagner Aff., Ex. A at 5-7.)

As Chief of Police, Mr. Summers also had frequent and meaningful contact with elected officials. The duties of this position state that Mr. Summers was required to prepare and present periodic reports to the City Council and City Manager. The Court acknowledges that the City Manager is an appointed not an elected official but still finds this factor is relevant given the City's structure and that the record is littered with several contacts between Mr. Summers as Chief of Police and Mr. Drabinski as the City Manager involving discussions over policy and operations of the police department.[18] This factor weighs slightly in favor of finding Mr. Summers to have been a policymaker.

---

[18] The City's Personnel Policy Manual describes the City's organizational structure as follows. (Dkt. 11-5, Wagner Aff., Ex. A at 5-7.) The City Council are elected public officials who serve as the governing body for the City and carry out local legislative duties and other obligations as provided by law as well as being the general policymaker with the authority to establish general policy for the City. The City Manager is appointed by the City Council and serves as the administrative head of the city government under the direction and supervision of the City Council. The City Manager has the authority to establish administrative policy and may designate personnel to help carry out administrative responsibilities, such as the department heads, as well as approve operational policies/practices for the City. Additionally, the City Manager has the general supervision over the business of the City and see that the ordinances and policies of the City are complied with and faithfully executed. Department heads, such as the Police Chief, are persons in charge of a department or other agency of the City government. They are appointed by the City Manager and confirmed by the City Council and work under the direction of the City Manager.

The Court has spent a great deal of time reviewing the record in this case and, having done so, finds that Mr. Summers was a policymaker. Taking the facts as alleged by Mr. Summers to be true for purposes of this Motion, the Court concludes that most of the *Fizio* factors weigh against Mr. Summer's position. More importantly, the Court finds that the Defendants have demonstrated "that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Hunt*, 672 F.3d at 611 (quoting *Branti*, 445 U.S. at 518). The duties of the Police Chief involve, in large part, implementation of the policies and directives of the City Council and demand a certain level of allegiance and affiliation to the City Council as well as the City Manager. The Affidavits of each of the City Council members reflects that they voted to approve the termination of Mr. Summers primarily because of his inability to work with Mr. Drabinski in this regard. Likewise, Mr. Drabinski stated in his deposition that he recommended terminating Mr. Summers because he did not "get on the bus" to work with Mr. Drabinski and that he instead contradicted Mr. Drabinski's goals for the department. Based on the foregoing, the Court finds that Mr. Summers falls within the policymaker exception allowing patronage dismissals. Accordingly, the Motion for Summary Judgement is granted on this claim as there was no First Amendment constitutional violation for Mr. Summers' dismissal.

## C.    Negligent Infliction of Emotional Distress

Mr. Summers' the twelfth claim for relief raises a claim for negligent infliction of emotional distress against Mr. Drabinski in his individual capacity. (Dkt. 1 at ¶¶ 183-189.) The Complaint alleges that Mr. Drabinski had a duty not to cause Mr. Summers unwarranted

emotional distress by deliberately and unlawfully retaliating against his exercise of his First Amendment right, reporting unlawful conduct, filing a tort claim, and engaging in a criminal investigation as part of his official job duties. Mr. Drabinski counters that the claim should be dismissed because Mr. Summers failed to file a notice of claim as required by the Idaho Tort Claims Act ("ITCA"). (Dkt. 11 at 19) (Dkt. 17 at 10.)

The ITCA provides for a 180-day notice requirement for informing the government of the basis for a tort claim. *See* Idaho Code §§ 6-906, 6-908. Failure to provide such notice is grounds for dismissal of the claim. *See Mitchell v. Bingham Memorial Hospital*, 942 P.2d 544, 548–49 (Idaho 1997). The Idaho Supreme Court has held that the filing of a notice of claim as required by the Tort Claims Act is "a mandatory condition precedent to bringing suit, the failure of which is fatal to a claim, no matter how legitimate." *Banks v. Univ. of Idaho*, 798 P.2d 452, 453 (Idaho 1990) (quoting *McQuillen v. City of Ammon*, 747 P.2d 741, 744 (Idaho 1987)). It is undisputed that no notice was filed in this case.

Mr. Summers instead argues the ITCA applies only to tort claims brought against an employee acting within the scope and course of his employment but the tort claim here is raised against Mr. Drabinski individually and thus not subject to the ITCA's notice requirement. (Dkt. 13 at 19.) Mr. Drabinski maintains the claim falls under the ITCA and a notice was required. The Court agrees with the defense.

The facts giving rise to the claim are clearly actions and conduct taken by Mr. Drabinski while he was performing his duties as the City Manager and, thus, were within the course and scope of his employment and subject to the ITCA notice requirement. *See*

*Anderson v. Spalding*, 50 P.3d 1004, 1013-14 (Idaho 2002). Mr. Summers has not rebutted the statutory presumption that the claim arises from conduct occurring during Mr. Drabinski's employment by merely stating that he is being sued in his "individual capacity." *Id.* Thus, the notice requirement of the ITCA applies here and Mr. Summers' failure to file such notice is fatal to his claim.

Mr. Summers also appears to re-couch his claim as one for intentional infliction of emotional distress, arguing that Mr. Drabinski engaged in malicious and intentional unlawful retaliation contrary to public policy and, therefore, such actions do not fall within the ITCA. (Dkt. 13 at 19-20.) To this argument Mr. Drabinski asserts that summary judgment is appropriate because there is no evidence that his conduct was extreme and outrageous or that Mr. Summers suffered sever emotional distress. (Dkt. 17 at 10.)

A claim for intentional infliction of emotional distress in Idaho requires the following elements: (1) that the defendant acted intentionally or recklessly; (2) that the defendant's conduct was extreme and outrageous; (3) that there was a causal connection between the defendant's conduct and the plaintiff's emotional distress; and (4) that the plaintiff's emotional distress was severe. *See Hopper v. Swinnerton*, 317 P.3d 698, 708 (Idaho 2013); *Alderson v. Bonner*, 132 P.3d 1261, 1267 (Idaho Ct.App.2006). "Liability for this intentional tort is generated only by conduct that is very extreme. The conduct must be not merely unjustifiable; it must rise to the level of atrocious and beyond all possible bounds of decency, such that it would cause an average member of the community to believe that it was outrageous." *Johnson v. McPhee*, 210 P.3d 563, 572 (Idaho Ct.App.2009) (citing *Edmondson*

*v. Shearer Lumber Prods.*, 75 P.3d 733, 741 (Idaho 2003) (marks omitted)). Mr. Summers has not alleged facts nor pointed to any evidence giving rise to the extreme and outrageous type of conduct required for such a claim.

Based on the foregoing, summary judgment is granted on this claim.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Defendants' Motion for Summary Judgment (Dkt. 11) is **GRANTED IN PART AND DENIED IN PART** as stated herein. This matter is currently set for trial on **April 7, 2015**. The parties are directed to confer with one another and submit a joint notice to the Court as whether they desire to proceed to trial as scheduled on the claims remaining in this action or whether the parties desire to pursue Alternative Dispute Resolution, Mediation, or Judicially Supervised Settlement Discussions. Such notice shall be filed on or before **February 23, 2015**.

2) Defendant's Motion to Strike (Dkt. 18) is **GRANTED IN PART AND DENIED IN PART**.

DATED: **January 29, 2015**



~~Honora~~ble Edward J. Lodge
U. S. District Judge